IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNIFER W. LEVY-TATUM | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| NAVIENT and SALLIE MAE BANK | : | NO. 15-3794 |

MEMORANDUM

Dalzell, J.                                                          January 7, 2016

## I.   Introduction

We consider here defendants' motion to dismiss plaintiff Jennifer W. Levy-Tatum's

complaint. This case involves a disputed private education loan taken out by Levy-Tatum's

daughter, with Levy-Tatum listed as the co-signer. Levy-Tatum alleges that the defendants,

Navient Solutions, Inc.[1] and Sallie Mae Bank, violated the Electronic Signatures in Global and

National Commerce Act, 15 U.S.C. § 7001 et seq. (the "E-Sign Act"), the Fair Debt Collection

Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA"), the Fair Credit Reporting Act, 15 U.S.C. §

1681 et seq. ("FCRA"), Pennsylvania's Electronic Transactions Act, 73 P.S. § 2260.101 et seq.

("PAETA"), Pennsylvania's Fair Credit Extension Uniformity Act, 73 P.S. § 2270.4 et seq.

("FCEUA"), and Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §

201-1 et seq. ("UTPCPL").

We have jurisdiction over Levy-Tatum's federal law claims pursuant to 28 U.S.C. § 1331

and supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367.

---

[1] Levy-Tatum sued "Navient," but defendant Navient informed us that it is properly
known as "Navient Solutions, Inc." and refers to itself in its pleadings as "NSI."  For purposes of
this Memorandum, we will refer to it as "Navient".

For the reasons explained below, we will dismiss the entire complaint with prejudice as to defendant Sallie Mae Bank, dismiss Counts I, IV, and V with prejudice as to defendant Navient, and dismiss Counts II, III, and VI without prejudice as to defendant Navient.

## II.   <u>Standard of Review</u>

A defendant moving to dismiss under Fed. R. Civ. P. 12(b)(6) bears the burden of proving that the plaintiff has failed to state a claim for relief. <u>See</u> Fed. R. Civ. P. 12(b)(6); <u>see also</u>, <u>e.g.</u>, <u>Hedges v. United States</u>, 404 F.3d 744, 750 (3d Cir. 2005). To survive a Rule 12(b)(6) motion, the complaint must contain sufficient factual matter, accepted as true, to state a facially plausible claim to relief. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678.

As the Supreme Court stresses, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action…do not suffice." <u>Id.</u> Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." <u>Twombly</u>, 550 U.S. at 555.

In the wake of <u>Twombly</u> and <u>Iqbal</u>, our Court of Appeals laid out a two-part test to apply when considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6):

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations omitted). In deciding a motion to dismiss, we may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record," and any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefits Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

We recite the facts as they appear in the complaint.

III.   **Factual Background**

On August 15, 2014, Levy-Tatum received a letter from Sallie Mae[2] informing her that her private education loan was past due. Compl. ¶ 11 & Ex. A (Letter from Sallie Mae to Jennifer Levy-Tatum (Aug. 8, 2014)). Levy-Tatum determined, after speaking with a customer service representative, that her daughter, Victoria Tatum, was the borrower on the loan, and that she, Jennifer Levy-Tatum, was listed as a co-signer. Id. at ¶¶ 12-19. Levy-Tatum "could not then, and does not now, recall having co-signed the Loan," which was for $13,600.00 in principal. Id. at ¶¶ 20, 104.

Prior to moving to Georgia in May of 2014 for a teaching job, Victoria Tatum lived in Pennsylvania with her mother. Id. at ¶ 22. Victoria had placed her loan in forbearance while she was in training that summer, since her job did not begin until August. Id. at ¶¶ 21, 23. After Levy-Tatum's phone conversation with Sallie Mae, Victoria paid to defer repayment of the loan until after she received her first paycheck. Id. at ¶ 24. But on September 25, 2014 Victoria was arrested and jailed in Newtown County, Georgia, where she has been held without bail awaiting

---

[2] As we will explain later, this "Sallie Mae" is not the same entity as defendant Sallie Mae Bank, but rather the same entity as defendant Navient.

trial. Id. at ¶ 25. After her arrest, Victoria gave her mother permission to open mail addressed to her at Levy-Tatum's address. Id. at ¶ 26.

In October of 2014, Levy-Tatum opened mail addressed to Victoria regarding Sallie Mae's split into two separate companies -- defendant Sallie Mae Bank and defendant Navient. Id. at ¶ 28 & Ex. B (Letter from Mike Maier, Senior Vice-President, Officer of the Customer Experience, Navient to Victoria Tatum (undated)). On October 21, 2014, Levy-Tatum spoke with a Navient representative regarding the loan. Id. at ¶ 29. Under protest, Levy-Tatum paid fifty dollars to Navient to defer payment on the loan while she investigated how she came to be named as the co-signer. Id. at ¶ 30.

Soon thereafter, Navient mailed Levy-Tatum (at her request) a copy of the Promissory Note and loan application. Id. at ¶¶ 31-32 & Ex. C (Letter from Navient Customer Service to Jennifer Levy-Tatum (Oct. 24, 2014)). The loan application was for a "Smart Option Student Loan" from Sallie Mae, listing Victoria Tatum as the student borrower and Levy-Tatum as the co-signer. Id. at Ex. C at 2. Levy-Tatum's employment information on the loan application was incorrect, the email address listed was not hers, and her alleged signature on the loan was rendered electronically. Id. at ¶ 33. Levy-Tatum wrote to Navient to question the validity of the loan documents and requested a copy of the original documents with her actual signature along with a transaction history. Id. at ¶ 34 & Ex. D (Letter from Jennifer Levy-Tatum to Navient (Nov. 22, 2014)).

In response, Navient sent Levy-Tatum a letter with an identity theft affidavit because she "alleged that someone used [her] identity without [her] knowledge or consent to obtain a student loan serviced by Navient." Id. at ¶ 36 & Ex. E (Letter from Navient Identity Theft Investigations to Jennifer Levy-Tatum (Dec. 8, 2014)). Levy-Tatum states that she "had not alleged that anyone

stole her identity," only that "she did not recall co-signing the Loan" and had therefore requested documentation from Navient to learn what procedures were used to authenticate her signature. Id. at ¶¶ 37-38. Levy-Tatum claims "that such information from Navient would refresh her memory if, in fact, she had co-signed the Loan." Id. at ¶ 39.

Levy-Tatum also refused to complete and return the seven-page identity theft affidavit because she found it unduly burdensome and believed that Navient "was attempting to switch the burden of proof" to her. Id. at ¶ 40. Levy-Tatum wrote back to Navient, in part:

> I have carefully examined my letter of November 22, 2014 and I see no allegation of identity theft in it. It appears from your letter of December 8 that Navient is attempting to put words into my mouth and thus shift the burden of proof from Navient to me. I understand that this is standard procedure in the loan industry, which anticipates that a family member, such as myself, will not want to press identity theft charges, but will instead meekly accept responsibility for the loan. It is my position that if industry procedure is so lax that loans are issued without verifying the authenticity of the signature of an alleged surety, then the burden should be on the issuer to prove that proper procedures were followed, and that the person who is alleged to have acted as surety did in fact agree to act as surety…
> Please be advised that I AM DISPUTING THIS DEBT and I will not be making any payment on this loan unless I receive proof that I actually agreed to act as surety for this loan.

Id. at Ex. F. at 1 (Letter from Jennifer Levy-Tatum to Navient Customer Service & Navient Identity Theft Investigations (Dec. 26, 2014)).

Navient sent Levy-Tatum another letter with yet another copy of the identity theft affidavit. Id. at ¶ 48 & Ex. G (Letter from Navient Identity Theft Investigations to Jennifer Levy-Tatum (Dec. 30, 2014)). Shortly thereafter, Navient sent Levy-Tatum another copy of the loan application and Promissory Note. Id. at ¶ 43.

The parties continued to fruitlessly exchange letters. Levy-Tatum wrote to Navient, again asserting that she had not alleged identity theft, but rather did not recall signing the documents

electronically, and refusing to make payments on the loan until Navient proved that she signed the documents electronically. Id. at ¶ 50 & Ex. H (Letter from Jennifer Levy-Tatum to Navient Customer Service & Navient Identity Theft Investigations (Jan. 19, 2015)). Navient again sent Levy-Tatum another copy of the loan application and Promissory Note, explaining that those documents showed she electronically co-signed for the loan on August 5, 2011. Id. at ¶¶ 54-55 & Ex. J (Letter from Navient Customer Service to Jennifer Levy-Tatum (Jan. 26, 2015)).

Levy-Tatum again wrote to Navient reiterating her claim that it, and not she, had alleged identity theft, demanding verification of her electronic signature, and asking Navient to "desist making harassing phone calls to [her] and instead respond directly to [her] letters." Id. at ¶ 58 & Ex. K (Letter from Jennifer Levy-Tatum to Debt Management & Collections Systems & Navient Fraud Investigation (Feb. 6, 2015)).

The exchange of letters continued. Navient wrote that it had updated Levy-Tatum's credit report to reflect the disputed loan, that it would continue to consider Levy-Tatum responsible for the loan until she completed the identity theft affidavit, and that its investigation confirmed that the information it provided to consumer reporting agencies regarding the loan was valid. Id. at ¶¶ 60-62 & Ex. L (Letter from Navient Identity Theft & Forgery Investigations to Jennifer Levy-Tatum (Feb. 19, 2015)). Levy-Tatum believes that Navient's assertion in that letter that it conducted a Fair Credit Reporting Act investigation is untrue. Id. at ¶ 63.

Navient wrote again, explaining that co-signers "are presented with a series of knowledge-based identity questions designed to prevent identity theft" and enclosing the loan application, Promissory Note, loan approval letter, and final disclosure statement for the loan, sent to Levy-Tatum on October 8, 2011. Id. at ¶¶ 64-66 & Ex. M (Letter from Brenda Davis, Officer of the Customer Advocate, Navient to Jennifer Levy-Tatum (Feb. 27, 2015)).  Levy-

Tatum responded, again protesting that she would not make payments on the loan until Navient proved that she had electronically co-signed for it. Id. at ¶ 67 & Ex. N (Letter from Jennifer Levy-Tatum to Brenda Davis, Officer of the Customer Advocate, Navient (Mar. 14, 2015)).

More letters ensued. Id. at ¶ 68. Navient wrote back, explaining that Levy-Tatum was listed as the co-signer of a Smart Option Student Loan that was disbursed on October 21, 2011 to her daughter, Victoria Tatum. Id. at Ex. O (Letter from Keith Dixon, Officer of the Customer Advocate, Navient to Jennifer Levy-Tatum (Mar. 26, 2015)). Dixon explained that the Promissory Note included her electronic signature and a valid Social Security number, that Levy-Tatum was informed in writing about the approval of the loan, and that if she wanted to pursue a fraud investigation she would have to complete the process with their Fraud Department. Id. Dixon's letter included "disclosures which he claimed had been mailed to Plaintiff in 2011." Id. at ¶ 69 & Ex. O at 11-14 (Letter from Sallie Mae to Jennifer Levy-Tatum (Oct. 8, 2011) & Smart Option Student Loan Final Disclosure). Levy-Tatum denies receiving those disclosures in October of 2011. Id. at ¶ 74.

On April 16, 2015, Wells Fargo Bank informed Levy-Tatum that it had reduced her credit limit from $10,000.00 to $1,600.00 based on information it received from Experian. Id. at ¶ 77. Levy-Tatum believes Navient's report of the disputed loan caused this reduction, since the disputed loan was the only negative item on her credit report, id. at ¶¶ 78-79, and she initiated an investigation with Experian on April 30, 2015, id. at ¶ 80. Levy-Tatum then wrote to Navient, explaining that she had suffered actual damages, reiterating her objections to Navient's failure to prove to her satisfaction that she had electronically co-signed for the loan, and threatening legal action. Id. at ¶ 81 & Ex. P (Letter from Jennifer Levy-Tatum to Keith Dixon, Office of the Customer Advocate, Navient (May 4, 2015)). Navient replied, explaining that the negative credit

report was valid and the information from the report could not be removed unless a fraud investigation determined that she did not co-sign for the loan. Id. at ¶ 82. Levy-Tatum maintains that Navient acted in bad faith by reporting to Experian and other credit reporting agencies that she was responsible for repaying the loan. Id. at ¶ 91.

Levy-Tatum also claims that she "has received numerous collection calls from various Navient representatives since August 2014 at her home and at her place of business." Id. at ¶ 92. She alleges that they have called several times a day, beginning "as early as 8:00 a.m. and continuing through the day until after 9:00 p.m.". Id. at ¶ 93. Levy-Tatum states that Navient continues to call her on a daily basis and send her invoices via U.S. mail. Id. at ¶ 103.

## IV.   **Discussion**

Defendants seek to dismiss all six causes of action in Levy-Tatum's complaint. They argue that Counts I and IV fail because there is no private right of action under either the E-Sign Act or Pennsylvania's Electronic Transactions Act. Def. Mem. at 6. Defendants argue that Count II is meritless because the FDCPA applies only to debt collectors and Levy-Tatum's allegations that she has been "harassed" are conclusory. Id. at 9-10. Defendants also contend that Counts V and VI fail to state a claim under the FCEUA and the UTPCPL because there is no private right of action under the FCEUA, no ascertainable loss under the UTPCPL, and the Fair Credit Reporting Act preempts the UTPCPL claims. Id. at 11-13. Defendants also urge that Count III, brought under the FCRA, fails as a matter of law because Levy-Tatum does not deny co-signing for the loan.[3] Id. at 14-15. Finally, defendants argue that Levy-Tatum has failed to state any

---

[3] In her complaint, Levy-Tatum does not flat-footedly deny co-signing for the loan, but rather avers that she cannot recall whether she did and that Navient cannot prove to her satisfaction that the electronic signature was authentic. See, e.g., Compl. ¶ 20 ("Plaintiff could not then, and does not now, recall having co-signed the Loan."); id. at ¶ 37 ("Plaintiff had not alleged that anyone stole her identity. Plaintiff had stated that she did not recall co-signing the

claim against Sallie Mae Bank, which is an entirely separate entity from Navient. Id. at 16-17.

Levy-Tatum opposes the defendants' motion to dismiss in its entirety.

### A.   Whether There Is A Private Right Of Action Under The E-Sign Act (Count I)

To determine whether there is a private right of action under a federal law, we begin with

the plain language of the statute. Lamie v. United States Tr., 540 U.S. 526, 534 (2004)

(explaining that "when the statute's language is plain, the sole function of the courts -- at least

where the disposition required by the text is not absurd -- is to enforce it according to its terms")

(citing Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) (in

turn quoting older cases)). Only in the face of ambiguous statutory text are we permitted to look

to the statute's legislative history or consult the relevant agency's interpretation of the statute.

---

Loan."); id. at ¶¶ 38-39 ("Plaintiff could not recall having co-signed the Loan…Plaintiff believed that such information from Navient would refresh her memory if, in fact, she had co-signed the Loan."); id. at ¶ 75 ("The issue is whether proper security procedures were followed during the loan application process to obtain Plaintiff's consent, and authenticate Plaintiff's electronic signature."). But, in her response in opposition to the motion to dismiss, Levy-Tatum clarifies: "Defendants are correct that Plaintiff does not recall signing the Loan. It is difficult to recall signing something that one did not sign.... Plaintiff is now convinced that she does not recall cosigning the Loan because she did not cosign the Loan." Pl. Resp. in Opp. at 14-15.

Fed. R. Civ. P. 8(d)(3) permits inconsistent claims or defenses, and courts have construed that rule to permit inconsistencies in both legal and factual allegations. Independent Enter. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1175 (3d Cir. 1997). A court may not construe a plaintiff's first claim as an admission against another alternative or inconsistent claim. Id.  See also 5 Wright & Miller, Fed. Prac. & Proc. Civ. § 1283 (3d ed. 2015) (explaining that even after reasonable inquiry, a party may need to assert contradictory statements when it is in doubt about the factual background of the case or the legal basis for relief). But a plaintiff cannot amend her complaint through a brief filed in opposition to a motion to dismiss. Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988).

While we cannot treat Levy-Tatum's belated denial of co-signing for the loan as an amendment to her complaint, we may consider her complaint as pleading neither that she did or did not cosign for the loan, but rather that she cannot recall whether she did. For purposes of the motion to dismiss, we accept that factual allegation of non-recollection as true. Still, we remind all parties and attorneys of their duties of reasonable inquiry. See, e.g., Fed. R. Civ. P. 11(b)(3)-(4).

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984). Congress itself may create -- explicitly or by implication -- any private right of action to enforce federal law. Alexander v. Sandoval, 532 U.S. 275, 286 (2001).

We must determine whether the statute manifests an intent to create both a private right and "also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." Id. at 286-87 (internal citations omitted). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'" Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002) (quoting Cannon v. University of Chicago, 441 U.S. 677, 692 n.13 (1979)). Even if a statute includes "such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private remedy.'" Id. (quoting Sandoval, 532 U.S. at 286 and adding emphases).

The E-Sign Act establishes that with respect to transactions in or affecting interstate commerce, signatures and contracts cannot be denied legal effect, validity, or enforceability solely because they are in electronic form. 15 U.S.C. § 7001(a)(1)-(2). While we need not rehearse the E-Sign Act in its entirety, suffice it to say it contains no rights-creating language and manifests no intent to create either a private right or remedy. The E-Sign Act simply establishes that contracts and signatures cannot be denied legal effect merely because they are in electronic form.[4] The E-Sign Act does include requirements for obtaining consent from consumers before

---

[4] Although Judge Stengel did not reach the question of whether the E-Sign Act contained an implied right of action, he did observe that "the purpose of the Act is to protect transactions from legal challenges that are solely based on the electronic form of the agreement. As the statute makes clear, the use or acceptance of electronic signatures is not mandatory." Prudential Ins. Co. of America v. Prusky, 413 F. Supp. 2d 489, 494 (E.D. Pa. 2005). See also Mraz v. Aetna Life Ins. Co., 2014 WL 5018862, *5 (M.D. Pa. Oct. 7, 2014) (Conaboy, J.) (citing the E-Sign

using electronic records. <u>See</u> 15 U.S.C. § 7001(c)(1)(C)(ii). But nothing in the statute suggests

that this is a private right much less that there is some private remedy, especially since the statute

expressly states that failure to obtain electronic consent from a consumer is not itself fatal to a

contract's validity or enforceability. 15 U.S.C. § 7001(c)(3).

   We therefore find that the E-Sign Act does not create a private right or remedy, either

expressly or by implication. We will dismiss Count I of Levy-Tatum's complaint with prejudice,

since amendment would be futile in light of this holding.

   **B.   Whether Levy-Tatum States A Claim Under The FDCPA (Count II)**

   Defendants argue that Count II of Levy-Tatum's complaint is meritless because the

FDCPA only applies to debt collectors and Levy-Tatum's assertions that Navient has harassed

her are conclusory. Def. Mem. at 9-10. Levy-Tatum responds that Navient is a debt collector and

that her complaint includes factual allegations regarding Navient's harassment. Pl. Resp. in Opp.

at 14-15, 17.

   The FDCPA defines a "debt collector" as "any person who uses any instrumentality of

interstate commerce or the mails in any business the principal purpose of which is the collection

of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or

---

Act and PAETA to demonstrate that Congress and Pennsylvania have expressly affirmed the
validity of electronic records and signatures).
   Levy-Tatum draws our attention to the U.S. Department of Education's Standards for
Electronic Signatures in Electronic Student Loan Transactions (Apr. 30, 2001) (revised as of July
25, 2001). <u>See</u> Pl. Resp. in Opp. App'x 1. These standards explain how the E-Sign Act's
provisions apply to electronic transactions conducted by lenders, guaranty agencies, schools, and
borrowers under certain student loan programs. <u>Id.</u> at 1. But this document does not, and cannot,
in contravention of the plain language of the E-Sign Act, create a private right or remedy. Rather,
this document explains the expectations for lenders and holders of student loans regarding the E-
Sign Act and sets forth the consequences from the Department of Education for failing to meet
those expectations.

due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). But the term "debt collector"
does not include "any person collecting or attempting to collect any debt owed or due or asserted
to be owed or due another to the extent such activity…concerns a debt which was not in default
at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F)(iii).

Defendants explain that on May 1, 2014, SLM Corporation, known to consumers as
Sallie Mae, went through a corporate reorganization, creating  (1) a restructured SLM
Corporation, which continued operating as a separate publicly traded company and included
Sallie Mae Bank, and (2) Navient Corporation, of which defendant Navient Solutions, Inc. is a
subsidiary. Def. Mem. at 16-17. We take judicial notice of these facts.[5]

Victoria Tatum took out the loan in question from the lender Sallie Mae in August of
2011. Compl. ¶¶ 11-19 & Ex. C. For the summer of 2014, Victoria paid to place her loan in
forbearance. Id. at ¶¶ 21-23. Levy-Tatum first received notice of the loan being past due in
August of 2014 in a letter from Sallie Mae, and shortly thereafter Victoria deferred repayment.
Id. at ¶¶ 23-24. Although Levy-Tatum did not learn of the corporate reorganization until October

---

[5] See, e.g., Navient Corp., Annual Report (Form 10-K) (Feb. 27, 2015), available at
http://www.navient.com/assets/about/investors/shareholder/annual-
reports/NAVI_2014_Form_10-K_2-27-15_Final.pdf. See also SLM Corp., Annual Report (Form
10-K) (Feb. 26, 2015), available at
https://www.salliemae.com/assets/about/investors/shareholder/annual-reports/201410K.pdf. See
generally Robert Farrington, How the Sallie Mae and Navient Split May Help Student Loan
Borrowers, Forbes.com, May 20, 2014,
http://www.forbes.com/sites/robertfarrington/2014/05/20/how-the-sallie-mae-navient-split-may-
help-student-loan-borrowers/ ("The new company which is being spun out -- Navient -- is
equivalent to the old Sallie Mae. It will continue to service the existing loans in the Sallie Mae
portfolio, as well as service new loans via contracts with the Department of Education. It will
also focus on servicing private student loans, as well as asset recovery…"); Federal Student Aid,
An Office of the U.S. Department of Education, Overview of Sallie Mae's Separation Into Two
Companies, undated, available at https://studentaid.ed.gov/sa/about/announcements/sallie-mae
("The new company, Navient, has assumed all the responsibilities previously performed by
Sallie Mae as a federal loan servicer. A loan servicer is a company that handles the billing and
other services on your federal student loan.").

of 2014, the split of Sallie Mae into a restructured SLM Corporation and Navient Corporation took place several months before. Id. at ¶ 28 & Ex. B.

Notably, Levy-Tatum's complaint fails to include any factual assertions to establish that Navient is a debt collector within the meaning of the FDCPA, as Navient, formerly known as Sallie Mae, has maintained responsibility for servicing the loan from its inception. Nor has Levy-Tatum pled facts to demonstrate that Navient is a debt collector by trade, or that the loan was in default during the relevant time period for this action.[6] Thus, Levy-Tatum has failed to plead that Navient is a debt collector within the meaning of 15 U.S.C. § 1692(a)(6)(F)(iii).[7] As we have determined that the complaint fails to include factual matter supporting its legal assertion that Navient is a debt collector within the meaning of the FDCPA or that the loan was in default, we do not consider the sufficiency of Levy-Tatum's allegations of harassment.

We will therefore dismiss Count II of Levy-Tatum's complaint with prejudice as to Sallie Mae Bank and without prejudice as to Navient.

## C.    Whether Levy-Tatum States A Claim Under The FCRA (Count III)

In Count III of her complaint, Levy-Tatum alleges that Navient violated the FCRA when it "willfully and intentionally reported the Loan to the credit bureaus as being in default under

---

[6] The complaint pleads that the loan was merely past due, an important legal distinction. Def. Reply at 4. See generally Skerry v. Massachusetts Higher Educ. Assistance Corp., 73 F. Supp. 2d 47, 54 (D. Mass. 1999) (collecting cases supporting the proposition that parties servicing non-defaulted loans are not subject to the FDCPA and explaining the difference between "past due" and "default").

[7] The Seventh Circuit found, in a controversy regarding student loans, that Sallie Mae Servicing Corp. was not a debt collector within the meaning of the FDCPA because the debt was not in default when Sallie Mae acquired it, and Sallie Mae's later declaration of the loan's default did not remove it from the statutory exemption. Johnson v. Sallie Mae Serv. Corp., 102 F. App'x 484, 487 (7th Cir. 2004) (non-precedential); see also Mondonedo v. Sallie Mae, Inc., 2009 WL 801784, *3 (D. Kan. Mar. 25, 2009) (Robinson, J.) (explaining that an entity that does not own the loan but merely services it is treated as a creditor and is generally not subject to the FDCPA).

Plaintiff's name, causing Plaintiff's credit to be damaged, and causing Wells Fargo Bank to reduce Plaintiff's credit limit," even though Navient knew that the information was unproven and disputed and it had not been able to show that the electronic signature on the loan was authentic. Compl. ¶¶ 168, 170-71. Defendants argue that Levy-Tatum's FCRA claim fails because she (1) only claims that she cannot recall whether she co-signed for the loan, and so cannot argue that Navient failed to investigate when she refused to complete an identity theft affidavit, and (2) failed to initiate a proper investigation or dispute with Experian. Def. Mem. at 15.

Furnishers of information to credit reporting agencies have an obligation to provide complete and accurate information in the first instance, but the FCRA explicitly precludes private suits for failure to comply and reserves enforcement of that specific statutory duty to federal and state officials. Seamans v. Temple Univ., 744 F.3d 853, 864 (3d Cir. 2014); 15 U.S.C. § 1681s-2(a) (duty to provide complete and accurate information in the first instance); 15 U.S.C. § 1681s-2(c) (precluding private suits for failure to comply with that duty); 15 U.S.C. § 1681s-2(d) (enforcement by federal and state officials). Private individuals must use 15 U.S.C. § 1681s-2(b) to recover damages, post-dispute, caused by a furnisher of information. SimmsParris v. Countrywide Fin. Corp., 652 F.3d 355, 358 (3d Cir. 2011).

But consumers bringing suit under Section 1681s-2(b) must first go through credit reporting agencies:

> Although consumer reporting agencies are subject to immediate suit by consumers…furnishers of the information are not. Instead, a private citizen wishing to bring an action against a furnisher must first file a dispute with the consumer reporting agency, which then must notify the furnisher of information that a dispute exists. Only after this notification can the furnisher face any liability to a private individual.

SimmsParris, 652 F.3d at 359. A credit reporting agency's dispute notification triggers the information furnisher's duty to investigate, but only if the furnisher fails to undertake a reasonable investigation following that notification does it become liable to a private litigant. Id.

Levy-Tatum alleges in her complaint that she initiated an investigation with Experian on April 30, 2015. Compl. ¶ 80. Experian then informed Levy-Tatum that the disputed Navient item would remain. Id. at ¶ 86 & Ex. Q (Letter from Experian to Jennifer W. Levy-Tatum (May 19, 2015)). But Levy-Tatum's complaint fails to plead facts regarding Navient's post-dispute investigation and whether that investigation was reasonable. Private persons can only sue furnishers of information directly for their failure to conduct a reasonable investigation after the credit reporting agency, alerted to the dispute by the consumer, alerts the furnisher. All of Levy-Tatum's factual pleadings are with respect to Navient's conduct before she initiated her investigation with Experian, and of her dissatisfaction with Navient's response after she informed it directly that she would be initiating an investigation with Experian. These facts, even taken as true, do not sufficiently plead that Navient failed to conduct a reasonable investigation after being notified by Experian of the dispute.

We will dismiss Count III of Levy-Tatum's complaint with prejudice as to Sallie Mae Bank and without prejudice as to Navient.

### D.     Whether There Is A Private Right Of Action Under Pennsylvania's Electronic Transactions Act (Count IV)

We next consider PAETA. To determine whether a Pennsylvania statute grants a private right of action, courts must consider whether (1) the plaintiff is one of the class for whose especial benefit the statute was enacted, (2) there is an indication of legislative intent, explicit or implicit, to create or deny a remedy, and (3) implying such a remedy for the plaintiff is

consistent with the legislative scheme's underlying purposes. Alfred M. Lutheran Distrib., Inc. v. A.P. Weilersbacher, Inc., 650 A.2d 83, 87 (Pa. Super. Ct. 1994) (citing Cort v. Ash, 422 U.S. 66, 78 (1975) and other federal law).

In the legislative findings preamble to PAETA, the General Assembly found and declared that (1) electronic commerce was rapidly expanding, (2) uniformity among state laws recognizing the validity and enforceability of electronic signatures, records, and writings was important to the continued expansion of electronic commerce, and (3) the rights of consumers under existing laws should be protected and preserved. 73 P.S. § 2260.102. Like the E-Sign Act, PAETA requires that parties consent to conducting transactions by electronic means, but does not require records or signatures to be made electronically. 73 P.S. § 2260.301(a)-(b). Like the E-Sign Act, PAETA is facially concerned with facilitating electronic transactions, 73 P.S. § 2260.302, the validity of electronic signatures, 73 P.S. § 2260.303, and other practical considerations, such as the retention of records in electronic transactions.

Levy-Tatum points to no language in the statute, nor were we able to find any such language, suggesting that she was of the class for whose especial benefit the statute was enacted. Nor could we find any language indicating legislative intent to create any remedy. PAETA is concerned with commerce generally, not consumers in particular, and is meant to affirm the validity and enforceability of electronic signatures and transactions. Although the General Assembly's legislative findings mention consumers' rights, it is in the specific context of such rights under existing law. The mere presence of a legislative finding mentioning consumers, absent any other textual guidance, does not suffice to demonstrate that implying a private remedy would be consistent with the state statute's underlying purposes.

16

We therefore find that there is no express or implied private right of action under PAETA. This legislative scheme, like the E-Sign Act, establishes the validity of electronic signatures, but does not provide consumers, or Levy-Tatum, with a private right of action. We will dismiss Count IV with prejudice as to both Sallie Mae Bank and Navient, since amendment by Levy-Tatum would be futile in light of this holding.

### E. Whether Levy-Tatum States A Claim
### Under The FCEUA Or UTPCPL (Counts V & VI)

Defendants argue that Levy-Tatum fails to state a claim in Counts V and VI of her complaint because there is no private right of action under the FCEUA, she has not pled an ascertainable loss to ground a claim under the UTPCPL, any claims for credit reporting harm are preempted by the FCRA, and her claim does not fall within the catchall provision of the UTPCPL. Def. Mem. at 11-14. Levy-Tatum argues that the defendants are liable for violations of the FCEUA for trying to force her to allege identity theft and complete an identity theft affidavit, claiming that she co-signed the loan without showing that they had authenticated her electronic signature, and communicating credit information "which it knew was unproven and disputed" to credit reporting agencies. Compl. ¶ 196. We consider Counts V and VI in turn.

### 1. The FCEUA, As Mediated By The UTPCPL (Count V)

The FCEUA establishes that it "shall constitute an unfair or deceptive debt collection act or practice under this act if a debt collector violates any of the provisions" of the FDCPA. 73 P.S. § 2270.4(a). To the extent that we have found Levy-Tatum has failed to state a claim under the FDCPA, then any claim she might have under 73 P.S. § 2270.4(a) necessarily fails. The FCEUA, however, also establishes rules for creditors, setting forth what constitutes unfair or deceptive acts or practices, including "any conduct the natural consequence of which is to harass,

oppress or abuse any person in connection with the collection of a debt." 73 P.S. § 2270.4(b)(4). The FCEUA makes clear that if "a debt collector or creditor engages in an unfair or deceptive debt collection act or practice under this act, it shall constitute a violation" of the UTPCPL. 73 P.S. § 2270.5(a) (emphasis added). As such, there is no private right of action under the FCEUA, but rather plaintiffs must avail themselves of the UTPCPL's remedial provision to obtain relief. See, e.g., Benner v. Bank of America, N.A., 917 F. Supp. 2d 338, 359 (E.D. Pa. 2013).[8]

To maintain a private right of action under the UTPCPL, a plaintiff must demonstrate that she suffered an ascertainable loss of money or property as a result of the defendant's prohibited conduct. Kaymark v. Bank of America, N.A., 783 F.3d 168, 180 (3d Cir. 2015) (citing Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004)). The Pennsylvania Supreme Court has not definitively addressed what constitutes an ascertainable loss under the UTPCPL, but our Court of Appeals has tried to predict what Pennsylvania's highest court would find if it addressed the question. Id. at 180-81 (finding persuasive lower state court decisions reasoning that ascertainable losses must be non-speculative and established from the factual circumstances surrounding each case). Courts have found an ascertainable loss to require an actual, non-speculative, loss of money or property. Benner, 917 F. Supp. 2d at 360 ("A plaintiff must be able to point to money or property that he would have had but for the defendant's fraudulent actions."). Merely retaining counsel to sue under the UTPCPL is not an ascertainable loss. Grimes v. Enterprise Leasing Co. of Phila., LLC, 105 A.3d 1188, 1190 (Pa. 2014).

---

[8] Levy-Tatum's citation to Kern v. Lehigh Valley Hospital, Inc., 108 A.3d 1281, 1290 (Pa. Super. Ct. 2015), bolsters this conclusion. The Pennsylvania Superior Court makes clear in Kern that FCEUA claims are included as additional violations of the UTPCPL, which permits them to be brought as private actions under the UTPCPL itself. Id. Because FCEUA claims must be brought as UTPCPL claims, plaintiffs must plead both justifiable reliance and ascertainable loss. Id.

While Levy-Tatum alleges in her complaint that Navient's phone calls were frequent enough and late enough at night to constitute harassment, Compl. ¶¶ 92-103, she notably does not allege any ascertainable loss of money or property as a result of such harassment.  The FCEUA prohibits harassing conduct by creditors, but plaintiffs must use the UTPCPL to allege violations of the FCEUA.  Because Levy-Tatum must use the UTPCPL to bring her FCEUA claim, she must also satisfy the UTPCPL's pleading requirement regarding ascertainable loss.

Levy-Tatum also pleads in her complaint that as a result of Navient reporting the disputed loan to Experian, Wells Fargo Bank reduced her credit limit from $10,000.00 to $1,600.00. Id. at ¶¶ 77-79. Without deciding whether a reduction in credit limit constitutes an ascertainable loss within the meaning of the UTPCPL, we consider the prior question of whether the FCRA preempts the claim.

The FCRA precludes the imposition of requirements or prohibitions under state law with respect to subject matter regulated under 15 U.S.C. § 1681s-2, relating to the responsibilities of persons who furnish information to consumer reporting agencies. 15 U.S.C. § 1681t(b)(1)((F). Section 1681s-2 prohibits furnishers of information from reporting information known to be inaccurate or that they have reasonable cause to believe is inaccurate. 15 U.S.C. § 1681s-2(a)(1)(A). Section 1681s-2 also defines "reasonable cause to believe that the information is inaccurate," duties to correct and update information, duties to provide notice of disputes, duties upon notice of identity-theft related information, and other duties. 15 U.S.C. § 1681s-2(a)-(d).

Since Section 1681t(b)(1)(F) prohibits states from imposing requirements with respect to the subject matter regulated under Section 1681s-2, which broadly regulates the conduct of furnishers of information to consumer reporting agencies, the FCRA preempts any claim under Pennsylvania's FCEUA, as brought through the UTPCPL, based upon conduct related to

furnishing information to a credit reporting agency. See also Grossman v. Trans Union, LLC, 992 F. Supp. 2d 495, 500 (E.D. Pa. 2014) (finding that Section 1681t(b)(1)(F) preempts all state law claims with respect to all subject matter regulated under Section 1681s-2 against furnishers of information to credit reporting agencies); Jaramillo v. Experian Info. Sol., Inc., 155 F. Supp. 2d 356, 361 (E.D. Pa. 2001) (explaining that the language of Section 1681t(b)(1)(F) makes clear that Congress intended to eliminate all state causes of action relating to the responsibilities of those who furnish information to consumer reporting agencies).

As Levy-Tatum's FCEUA claim must be brought via the UTPCPL's remedial provision, the UTPCPL's requirements for pleading ascertainable loss apply. As the only plausibly ascertainable loss pled by Levy-Tatum is the reduction of her credit limit by Wells Fargo Bank -- and again, we do not opine on whether this actually constitutes an ascertainable loss within the meaning of the UTPCPL -- we must look to what prohibited conduct allegedly caused that alleged ascertainable loss. As Levy-Tatum pleads that Navient's reporting of the disputed loan caused the reduction in her credit limit, we must consider whether such conduct is regulated by the FCRA. The FCRA precludes state law requirements or prohibitions regarding conduct regulated by the FCRA with respect to those who furnish information to credit reporting agencies. As Navient's conduct was in the nature of furnishing information to Experian, Levy-Tatum's state law action complaining of that conduct is precluded by the FCRA itself. The FCRA therefore preempts Levy-Tatum's only plausible claim from the FCEUA, as necessarily brought via the UTPCPL's remedial provision.

We therefore find that Levy-Tatum fails to state a claim under the FCEUA because her claim, as mediated by the pleading requirements of the UTPCPL, is preempted by the FCRA. We will therefore dismiss Count V with prejudice as to both Sallie Mae Bank and Navient.

2.      **The UTPCPL's Catchall Provision (Count VI)**

We next consider whether Levy-Tatum has otherwise stated a claim under the UTPCPL in Count VI. Levy-Tatum alleges that defendants are liable for violations of the UTPCPL for using inappropriate security procedures to ensure that the electronic signature on the loan was Levy-Tatum's, for attempting to shift the burden of proof to her by demanding that she complete an identity theft affidavit, for attempting to coerce her into assuming the loan using the identity theft affidavit, for reporting "unproven and disputed" credit information to the credit bureaus, and for damaging Levy-Tatum's credit rating by reporting the loan without noting that it was disputed. Compl. ¶¶ 207-10.

As explained above, the FCRA preempts all state law claims asserted against furnishers of information to credit reporting agencies regarding all subject matter regulated under Section 1681s-2. See Grossman, 992 F. Supp. 2d at 500; Jaramillo, 155 F. Supp. 2d at 361. The FCRA preempts all claims brought under the UTPCPL with respect to Navient reporting information to Experian. We therefore only consider Levy-Tatum's remaining allegations regarding Navient's security procedures for verifying electronic signatures and its requests that Levy-Tatum complete an identity theft affidavit.

Levy-Tatum does not explain how these two allegations fall within the UTPCPL's definitions of "unfair methods of competition" or "unfair or deceptive acts or practices." 73 P.S. § 201-2(4). The UTPCPL does contain a catchall provision, defining "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" as an unfair method of competition or unfair or deceptive act or practice. 73 P.S. § 201-2(4)(xxi). This catchall provision seems to embody common law fraud, but our Court of Appeals has recently predicted that, if called to decide the issue, the Pennsylvania Supreme Court would not

require a plaintiff to plead or prove all the elements of common law fraud if she alleged only

deceptive conduct. Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 498 (3d Cir. 2013).

Deceptive conduct requires knowledge of the falsity or misleading quality of one's conduct,

whereas the traditional elements of common law fraud are (1) misrepresentation of a material

fact, (2) scienter, (3) intent to induce action, (4) justifiable reliance, and (5) damage as a

proximate result. Chiles v. Ameriquest Mortg. Co., 551 F. Supp. 2d 393, 398 n.4 (E.D. Pa.

2008).

      Levy-Tatum fails to plead a plausible claim to relief under the UTPCPL's catchall

provision because she does not plead sufficient factual matter, accepted as true, to demonstrate

any deceptive conduct by Navient. Levy-Tatum does not plead that Navient's allegedly

inappropriate security measures to ensure that electronic signatures are authentic involve

deceptive conduct or conduct meant to mislead, nor how she herself was misled or deceived by

Navient's practices in this regard. Nor does she plead that there was any deception or intent to

mislead in Navient's attempts to have her complete an identity theft affidavit. While Levy-Tatum

asserts that Navient is attempting to shift some burden of proof to her, that is not deceptive or

misleading conduct, but rather a straightforward procedure for trying to ferret out identity theft

or fraud. Levy-Tatum's beliefs and averments that being asked to fill out the identity theft

affidavit was unfair, or burdensome, does not make Navient's conduct deceptive or misleading

within the meaning of the UTPCPL. Navient has been exquisitely clear, as documented by Levy-

Tatum's own exhibits, that if she did not believe that she had been the one to affix her electronic

signature to Victoria Tatum's loan, Navient could only assist her if she filled out such an

affidavit. There is nothing deceptive or misleading in such statements or conduct. Levy-Tatum

also fails to plead any ascertainable loss caused by this allegedly prohibited conduct. See 73 P.S.

§ 201-9.2(a) (setting forth the ascertainable loss requirement in the context of the UTPCPL's remedial provision).

As Levy-Tatum fails to plead a plausible claim to relief under the UTPCPL's catchall provision, we will dismiss Count VI with prejudice as to Sallie Mae Bank and without prejudice as to Navient.

### F.      Whether Levy-Tatum States A Claim Against Sallie Mae Bank

We have taken judicial notice of the fact that defendant Navient, formerly known as Sallie Mae, is not the same entity as Sallie Mae Bank. Levy-Tatum's complaint fails to allege any wrongdoing by the entity Sallie Mae Bank, as her complaint's allegations are entirely concerned with Navient's conduct since it became Navient or when it was known as Sallie Mae. We will therefore dismiss the entire complaint with prejudice as to defendant Sallie Mae Bank.

### G.      Levy-Tatum's Prayer For Relief Under The Declaratory Judgment Act

In her response in opposition to defendants' motion to dismiss, Levy-Tatum includes a prayer for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). Pl. Resp. in Opp. at 25. As the defendants point out, Levy-Tatum's complaint does not contain a separate cause of action under the Declaratory Judgment Act, but it does include, in its prayer for relief, a request for "appropriate declaratory relief regarding the predatory lending practices" of the defendants. See Def. Reply at 8 & Compl. at p. 36. But since we are already dismissing the entire complaint, and Levy-Tatum cannot use her response in opposition to the motion to dismiss to amend her complaint to include a cause of action under the Declaratory Judgment Act, we need not

specifically address these issues at this procedural juncture.

**V.**     **Conclusion**

Levy-Tatum's complaint fails to state a claim upon which relief can be granted. Counts I and IV fail because the E-Sign Act and PAETA do not create private rights of action. Count II fails because Levy-Tatum has failed to allege facts, accepted as true, pleading that Navient is a debt collector within the meaning of the FDCPA. Count III fails because Levy-Tatum fails to allege facts, accepted as true, pleading that Navient failed to conduct a reasonable investigation after learning of Levy-Tatum's dispute from Experian. Count V fails because Levy-Tatum's FCEUA claim, which can only be brought through the UTPCPL, is preempted by the FCRA. Count VI fails because Levy-Tatum fails to allege facts, accepted as true, that demonstrate Navient has engaged in deceptive or misleading practices or that she suffered an ascertainable loss.

We will dismiss Counts I, IV, and V with prejudice as to both Navient and Sallie Mae Bank, as amendment would be futile. Although we will also dismiss Counts II, III, and VI with prejudice as to Sallie Mae Bank, we will dismiss them without prejudice as to Navient. An appropriate Order follows.

BY THE COURT

/S/ STEWART DALZELL, J.
